Matter of State of New York v Luis F. (2025 NY Slip Op 51421(U))

[*1]

Matter of State of New York v Luis F.

2025 NY Slip Op 51421(U)

Decided on September 8, 2025

Supreme Court, New York County

Conviser, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 8, 2025
Supreme Court, New York County

In the Matter of the Application of The State of New York, Petitioner,

against
Luis F., Respondent, For Commitment Under Article 10 of the Mental Hygiene Law.

SMZ-74198-2022

New York State Attorney General Letitia James (Jeffrey Jackson, of counsel) for the State
Cohen, Forman & Barone (David Cohen, of counsel) for the Respondent

Daniel Conviser, J.

The Respondent is the subject of a petition for sex offender civil management pursuant to Article 10 of the Mental Hygiene Law ("Article 10", the "Sex Offender Management and Treatment Act" or "SOMTA"). The Court conducted a bench trial which ended with closing arguments on August 11, 2025 to determine if the State had proven by clear and convincing evidence that the Respondent was a sex offender who suffered from a Mental Abnormality under Article 10. For the reasons outlined here, the court finds that the State did not prove the Respondent was a sex offender who suffered from a Mental Abnormality. The petition is therefore ordered to be dismissed. The court has stayed its dismissal order for 30 days to allow the State to seek a stay pending appeal from the Appellate Division if they choose to do so.
The State presented the testimony of two psychologists, Dr. Shari Lo-Rhoden and Dr. Stuart Kirschner, who both opined that the Respondent had a Mental Abnormality under Article 10. The Respondent presented the testimony of a psychologist, Dr. Joe Scroppo, who reached the opposite conclusion. All were qualified without objection as experts in the field of psychology. Mr. F. was born in 1963 and he is almost 62 years old. 
The Expert Evaluations
Dr. Kirschner
Mr. F. declined to be interviewed by Dr. Kirschner and so his evaluation was based on a record review. Dr. Kirschner has conducted 350 or so evaluations under Article 10 and testified in about half of them. When asked whether it was better or worse, with respect to an Article 10 evaluation, to speak to a respondent, Dr. Kirschner said "I don't know if it's necessarily better or worse" but then allowed that "there are certain things that make it better" to speak to a [*2]respondent. Transcript., p. 52. He later said he had "no particular preference" with respect to whether or not he spoke to a respondent. Id., p. 56. Dr. Kirschner said he believed Mr. F. had been "aggressive" during his interviews with the other two doctors. He said that 90 % of an evaluation is based on information other than a respondent's interview. Id., p. 60. Dr. Kirschner read the reports of the other two doctors but did not have conversations with them or others about the case.
Dr. Kirschner said that the last time he disagreed with a Mental Abnormality determination proffered by the State was in 2010. He said that in the past 15 years, in over 300 independent Article 10 evaluations, he had never disagreed with the State's Mental Abnormality determination. On cross-examination, Dr. Kirschner acknowledged that the vast majority of his 57 page report copied records from other sources or outlined general information about diagnoses and that the "meat" of his original work was contained in two pages of his report. Id., p. 109. 
Dr. Lo-Rhoden
Dr. Lo-Rhoden is a psychologist employed by the New York State Office of Mental Health ('OMH"). She was first asked to evaluate Mr. F. in 2022. She issued a report on July 18, 2022 and spoke to Mr. F. by telehealth. She updated her report three years later but did not re-interview Mr. F. after interviewing him for her 2022 report. She said she had reviewed records for the past three years and read Dr. Scroppo's report of his more recent interview of the Respondent.
She noted that Mr. F. had been shouting and screaming at her during points of her interview. She said she had done about 35 Article 10 evaluations and had never seen as many sexual disciplinary infractions as Mr. F. had accumulated (discussed below). Dr. Lo-Rhoden said telemedicine interviews were standard for OMH in Article 10 cases but that she was not prohibited from interviewing Mr. F. in-person.
Dr. Scroppo
Dr. Scroppo met with Mr. F. twice in-person while Mr. F. was incarcerated and then conducted additional interviews by video. He spent a total of 18 hours with Mr. F. He interviewed him for 8 hours in-person. During the first session, he conducted psychological testing for about 6 hours and said this interview went fine. The following day Dr. Scroppo again met with Mr. F. and had to terminate the interview because Mr. F. was "kind of heated" spoke in a loud voice and interrupted him. Id., p. 245. He said Mr. F. was not physically or verbally threatening but described him as belligerent. Dr. Scroppo was able to complete the interview later by video.
Dr. Scroppo said the face-to-face time with Mr. F. was valuable. "[T}here's a lot of information that comes from a person without — that's non-verbal, you know, their eye contact, the way that they're holding themselves, the way they speak that isn't really easily captured unless you're right there close to them." Id., p. 247. He completed his report and then an amended report in April of 2025 but during his testimony was confused about whether he had authored one or two versions of his report.
Mr. F.'s Sexual Offense Criminal History
Mr. F.'s first sexual offense occurred when he was 15 years old and attempted to rape an adult female and injured the victim's back. He was adjudicated as a juvenile delinquent for attempted rape and placed in a youth center for 12 months. Dr. Scroppo said he believed Mr. F. had "smoked a little bit of weed on that day". Id., p. 283. Mr. F. denied sexual abuse had taken [*3]place when he spoke to Dr. Lo-Rhoden. He said there was a language barrier and he had approached the victim and lifted her legs because he wanted to have sex with her. Dr. Scroppo said that substantially less than 50% of juvenile sex offenders went on the commit adult sexual offenses but could not narrow down the percentage further.
Mr. F. pled guilty in 1997 to Assault in the Second Degree for a crime which occurred while he was incarcerated in state prison for a robbery which occurred in 1980. Dr. Lo-Rhoden described the disposition as an "Alford plea" [in which the Defendant does not admit guilt but pleads guilty]. Id., p. 125. In that incident, Mr. F., at age 33 in 1996, went to a dental clinic, pulled a female dental hygienist into a secluded x-ray room, put his hand over her mouth and around her neck and tried to rape her. Dr. Kirschner said Mr. F. had told the victim she was pretty. She bit his hand, screamed and was able to escape. When Mr. F. was restrained it was noted that his penis was out of his pants. A subsequent search of his cell did not reveal any drugs. He was initially charged with unlawful imprisonment and Assault in the Second Degree for that crime but was never charged with a sexual offense. He was also given 3000 days in a special housing unit [generally a solitary confinement cell].
Mr. F. was also noted to have written two "love letters" to a staff member following this incident, although it wasn't clear if those letters were written to the victim. Dr. Kirschner opined this indicated Mr. F. had difficulty with his sexual urges. Mr. F. told Dr. Lo-Rhoden that he had been engaged in a sexual relationship with the dental hygienist [apparently referring to a consensual relationship] and was about to engage in sex with her when he was assaulted by corrections officers.
The final "instant offense" which qualified Mr. F. for civil management occurred on July 26, 2018.[FN1]
He followed a 14-year-old girl into an elevator at 8:30 p.m. He said he "wanted pussy" or would hurt her. Id., p. 17. He attempted to grab her vagina twice. When the elevator reached the 9th floor she tried to escape and he blocked her but she was then able to get away. Mr. F. was tried and convicted of Attempted Sexual Abuse in the First Degree, a Class E felony, and sentenced to a determinate sentence of 4 years followed by a period of post-release supervision with a term of 15 years.
After the incident the complainant repeatedly said Mr. F. never touched her. She also testified in the grand jury that Mr. F. never touched her. Dr. Kirschner said, however, that surveillance video indicated Mr. F. had touched the victim and so the complaint was amended to indicate that such touching had taken place. Dr. Lo-Rhoden said that the surveillance video indicated Mr. F. had touched the victim's buttocks and vagina and that when the victim was confronted with this video evidence she continued to deny that Mr. F. had touched her.
Dr. Kirschner said Mr. F. described the instant offense as an attempt to grab a cell phone from a 14 year old girl who he believed was videotaping him after he stole merchandise. Dr. Lo-Rhoden said that Mr. F. had reported he was "paranoid" about the victim recording him because he was under the influence of cocaine and marijuana and denied any sexual abuse. Id., pp. 138-139. Dr. Lo-Rhoden said she believed drug use had disinhibited Mr. F. from controlling his [*4]sexual offending and said she credited his report of drug use on that occasion, but did not credit his assertion that he had not sexually offended. Dr. Scroppo opined there was "some interaction" between Mr. F.'s using cocaine on that day and his offense. Id., p. 282. Dr. Lo-Rhoden noted that Mr. F.'s first and most recent instant offense involved stranger victims and appeared to be impulsive. His angry outbursts reflect a lack of behavioral control. Dr. Scroppo testified that Mr. F. had said his behavior during the instant offense was inappropriate but that Mr. F. did not say he had committed a sex offense.
When asked whether he had any view about why Mr. F. did not commit a sexual offense while in the community from 2003 to 2018 [discussed below] but then committed the instant offense, Dr. Scroppo said he believed this might have been connected to Mr. F.'s using cocaine on that date and that Mr. F. was coming down from cocaine and wanted more. Mr. F. was carrying stolen goods at the time and may have become paranoid that the victim had a camera and was recording him. Dr. Scroppo described this crime as a "one-off" [with respect to Mr. F.'s recent history]. Id., p. 287.
Mr. F.'s Non-Sexual Offense History
Mr. F. has an extensive non-sexual offense history. While under juvenile supervision in 1979 he needed a place to stay, stayed with a man and had sex with him. During the course of that stay, he threatened the man with a knife, forced him to undress and stole $10 and other items from him. Mr. F. pled guilty to robbery and received an indeterminate sentence of 18-54 months.
Dr. Kirschner testified that Mr. F. had been arrested 80 times and convicted in 75% of those cases. He said Mr. F. was arrested 55 times between 2003 and 2018 with about 35 of those arrests for drugs. Dr. Lo-Rhoden said that Mr. F. had been arrested about 50 times [apparently during his life] for drug offenses. Dr. Lo-Rhoden agreed that Mr. F. had been in the community between arrests and periods in jail or prison "dozens of times" between 2003 and 2017. Id., p. 134. He has violated parole on at least four occasions and used over 6 aliases. He provided a false address to a parole officer. He has had numerous arrests for petty larceny often from drugstores and has sometimes fought with staff who detected him. He committed a street robbery and hit the victim with a piece of wood when the victim chased him. He was also convicted of a burglary crime. He has evidenced criminal versatility given that he committed non-violent and violent offenses. There was no evidence Mr. F. committed or attempted to commit a sexual offense either in the community or while incarcerated between 2001 [his last prison sexual infraction discussed below] and 2018 [when he committed the instant offense]. Mr. F. was in the community, on and off, during 15 years during that time [from 2003 until 2018].
Dr. Kirschner said Mr. F. had no less than ten drug convictions for both possession and sale. Dr. Lo-Rhoden agreed that while in the community Mr. F. sold drugs to support his drug habit and living expenses. She said he had reported using drugs as often as once per day. Dr. Lo-Rhoden also agreed that none of Mr. F.'s drug crimes had a sexual component.
Mr. F.'s Prison Disciplinary History
Mr. F. had two sexual disciplinary infractions during his first period of incarceration. In an incident on August 23, 1982, he got behind a corrections officer, whispered to her, pressed his body against hers, said she looked "real nice" and kissed her in the ear. Id., p. 19. She told him to back away and he became agitated. Dr. Lo-Rhoden found this incident significant. On March 18, 1983, he exposed himself. In an incarceration from May 24, 1988 to September 26, 2003 for [*5]robbery, Mr. F. received 22 sexual disciplinary infractions. Many of them were for masturbating in front of female corrections officers. Dr. Kirschner acknowledged that some of these incidents occurred while Mr. F. was in a cell and that he did not have privacy. Dr. Kirschner considered incidents in which Mr. F. left ejaculate on a table or floor or aimed ejaculate at the body of a victim to be particularly salient.
On June 10, 1992, he entered a room where a female corrections officer was alone, masturbated and ejaculated onto a table and floor in the area where she was working. On July 20, 1993 he masturbated and ejaculated towards a female staff person, narrowly missing her leg and shoe. On July 31, 1993 he masturbated in front of a female nurse. On December 8, 1994 he masturbated in front of a female social worker and left ejaculate outside her office door. On May 22, 2001, he aimed ejaculate at a female corrections counselor. Dr. Kirschner said Mr. F.'s prison masturbation incidents included him asking corrections personnel to watch him. The 22 sexual disciplinary infractions occurred between 1988 to 2001, a period of about 13 years. Dr. Kirschner described this as a propensity to commit prison sexual disciplinary infractions. He also said the quality of the infractions was important because they did not just involve masturbating to non-consenting victims but attempting to hit them with ejaculate on some occasions. None of Mr. F.'s prison disciplinary sexual infractions were connected to any allegation of substance abuse. Dr. Lo-Rhoden noted that Mr. F. had continued to commit sexual offense disciplinary infractions even after he had been sanctioned for committing them numerous times. She said he had cursed at staff with respect to the interactions and described the incidents as "sexualized aggression". Id., p. 145. Dr. Lo-Rhoden testified that none of Mr. F.'s sexual disciplinary infractions had a drug component.
Mr. F. has been incarcerated during various times after 2003 but the last sexual disciplinary infraction occurred in 2001. He was released from that period of incarceration, which spanned from 1988 to 2003 on September 26, 2003. Dr. Kirschner said Mr. F. has done five terms of state incarceration in 1980, 1988, 2009, 2015 and 2018. He has no less than 15 periods of incarceration in county jails and such terms have been both in New York and Massachusetts. He was incarcerated from 2009-2011 and from 2015-2017 for non-sexual offenses.
With respect to Mr. F.'s total amount of disciplinary infractions, Dr. Kirschner testified he had 3 Tier 2 infractions and 2 Tier 3 infractions since his 2019 incarceration. During prior prison terms he had 33 Tier 2 infractions and 40 Tier 3 infractions. Dr. Lo-Rhoden said she was not aware of any disciplinary infraction Mr. F. had ever received for substance use. Dr. Lo-Rhoden agreed that Mr. F.'s rate of disciplinary tickets had reduced since 2003. With respect to his criminal sentence, Mr. F. will be supervised on parole until 2037.
Mr. F. told Dr. Scroppo that he ceased committing sexual disciplinary infractions both because he realized it would compromise his liberty and because he gave up the notion that this was an appropriate behavior. He said he had formerly believed such behavior was appropriate from seeing other incarcerated people engaging in sexual disciplinary infractions and because he had been sexually abused as a child.
Mr. F.'s History While Confined by the Office of Mental Health
Mr. F. has been confined under Article 10 awaiting trial since September of 2024 at the State Treatment and Rehabilitation Center at Oakview, in Oneida County ("STARC"), which was formerly known as the Central New York Psychiatric Center ("CNYPC"). Dr. Lo-Rhoden said he had not incurred any disciplinary infractions. In June of 2025 Mr. F. had a physical [*6]altercation with a peer where they both threw punches. Dr. Lo-Rhoden said he had lost 7 days of privileges in the day room for that incident He was argumentative with staff in May of 2025 and has engaged in arguments with peers and refused directions to leave an area during arguments. Dr. Kirschner testified that Mr. F. talks over people and that at intake in September of 2024 it was difficult for the interviewer to obtain information from him.
Dr. Kirschner cited an incident from the STARC records where Mr. F. was seen staring at a female staff member in September of 2024 and refused to stop when told. He testified that Mr. F. became agitated and angry when told to stop staring and was then directed to a different area. Mr. F. was also reported to have screamed profanities. Dr. Lo-Rhoden said Mr. F. had been seated during the staring incident. Dr. Kirschner said staring had also preceded his earlier masturbation incidents and described the staring incident in 2024 as a "precursor" to lewd conduct. Id., p. 40. He acknowledged that the fact the incident didn't include masturbating or any physically threatening offensive behavior reflected progress but opined Mr. F. continued to condone his own behavior and think of himself as a victim. Dr. Kirschner opined that it was a positive thing that Mr. F. was now in a treatment facility.
Dr. Lo-Rhoden said such staring was a frequent intimidation tactic in institutional settings and that the incident reflected "poor boundaries" given Mr. F.'s previous masturbation offenses. Id., p. 141. Dr. Lo-Rhoden also recounted an incident where a resident was staring at Mr. F. and the two had to be separated.
STARC records indicate Mr. F. has been determined not to have sexual preoccupation. He has not made statements indicating an intent to sexually re-offend. He has been reported not to have any sexual hallucinations. Defendant's counsel and Dr. Lo-Rhoden then disagreed about whether a form on which boxes were checked indicated additional positive characteristics or a need to continue treatment.
Dr. Lo-Rhoden opined that Mr. F. was going in the "right direction" in the sense that he has been able to participate in sex offender treatment at STARC. Id., p. 138. She described him as "poor in terms of treatment outcomes" because he continues to deny his offending and so is impaired in his ability to address the skills necessary to avoid offending. Id.
Dr. Lo-Rhoden said treatment notes indicated that Mr. F. had calmed down over time with respect to his agitation but that he still attempted to dictate treatment and be treated differently than other residents. She acknowledged that her report outlined a May 15th, 2025 STARC progress note indicating Mr. F. asserted he was treated unfairly by others. A treatment note three days earlier, however, relayed significant positive information about Mr. F. including that he cooperated with and attended treatment sessions and offered significant insights into the origins of his anxiety, impulsivity and poor emotion management. It noted he was making progress in not interrupting people. Dr Lo-Rhoden did not include any of this information in her report. She also acknowledged not including other information during that time period reflecting his progress in being less defensive.
Progress notes indicated Mr. F. was willing to learn and change and was having fewer emotional outbursts. Dr. Lo-Rhoden did not include these assessments in her report. She said: "It's still in terms of consideration of his overall behaviors in terms of what's significant. It's one thing to perform well with manuals, treatment manuals. It's another in terms of his cooperation, behavior with treatment staff and other people in terms of at STARC". Id., pp. 21-212. Dr. Lo-Rhoden noted in her report that on May 29, 2005, Mr. F. became verbally aggressive with another resident about a television issue and when told to stop refused to do so. Dr. Lo-Rhoden [*7]did not include a treatment note from the following day, however. This indicated he had been cooperative and pleasant in participating in a game. On June 20, 2025, Dr. Lo-Rhoden noted that Mr. F. had a physical fight with a peer. On that same date, however, there was another note which Dr. Lo-Rhoden did not include in her evaluation. This detailed Mr. F.'s cooperation in treatment and statement that he believed treatment was helping him and that he wanted to change his mood and attitude.
Dr. Scroppo opined that Dr. Lo-Rhoden practiced "selective quoting" of STARC records in her report which he said gave the impression she was "cherry picking" negative things from the records she reviewed. Id., p. 272. He said her updated report on Mr. F.'s behavior at STARC was almost completely negative but that the picture was more complex. Dr. Scroppo acknowledged Mr. F. got into arguments and talked loudly and over people. But he also said Mr. F. always attended group sessions and almost always completed his assignments. Dr. Scroppo also said that on multiple occasions when Mr. F. was criticized for speaking loudly, he recognized the problem and corrected it. He said Mr. F. voluntarily participated in group discussions in a positive way. He has acknowledged difficult issues like his anxiety, trauma and oppositional behavior with insight. He has become much less offensive and has assisted peers. Staff noted Mr. F.'s increased self-control and less frequent outbursts.
Sex Offender, Drug & Mental Health Treatment
Mr. F. was in sex offender treatment in DOCCS on two occasions. He completed a program in 2022, which ran from May to October of 2022. Dr. Kirschner described this as positive but said he didn't see a lasting impact because Mr. F. continued to deny his sexual offending and did not have a relapse prevention plan. Mr. F. also participated in another program which was terminated (although there was no evidence the program was terminated due to any problematic behavior by Mr. F.) Dr. Lo-Rhoden said this program had lasted from August to December of 2021. Dr. Lo-Rhoden on cross-examination acknowledged that Mr. F.'s completion of sex offender treatment in DOCCS was a positive thing but did not mention it in her report. Dr. Lo-Rhoden noted that Mr. F. has not admitted to the sexual components of his offending. He expresses no remorse for any of his crimes and blames other people for his situation.
At STARC, Dr. Kirschner said Mr. F. participates in groups but talks over people and avoids being redirected. Mr. F. completed two drug treatment programs in prison. He completed the ASAP program from March to September of 2010. He then participated in another drug treatment program which closed from July to October of 2012. Dr. Scroppo said Mr. F. had completed about 20 months of drug treatment and additional drug treatment while in the community. He opined Mr. F. likely received some benefit from this treatment. He also said Mr. F. had acquired a vocational certificate.
Dr. Lo-Rhoden said Mr. F. admitted to using drugs while incarcerated but said he had reduced his consumption due to the higher cost of drugs in prison. She said his completion of sex offender treatment did not change her opinion regarding Mr. F.'s serious difficulty in controlling sexually offending behavior because he still had work to do, continued to try to dictate his treatment and didn't address the sexual components of his offending. While denial didn't increase the actuarial risk to re-offend, she said, it did negatively impact treatment outcomes.
During her testimony, Dr. Lo-Rhoden discussed the DOCCS Sex Offender Treatment Intervention and Progress Scale ("SOTIPS") dated October 31, 2022. The SOTIPS form has [*8]scores from 0, meaning minimal or no need for improvement up to 3, which reflects a very considerable need for treatment. Mr. S. was scored with a 0 for sexual behavior, sexual attitudes, sexual interest and sexual knowledge. Dr. Lo-Rhoden did not include these designations in her report. She also discussed the STABLE 2007 risk instrument during her testimony. That instrument completed in 2022 indicated Mr. F. was not sexually preoccupied. It reported Mr. F. did not use sex as a coping mechanism or evidence hostility towards women. Dr. Lo-Rhoden did not note any of these conclusions in her updated report. OMH reported that Mr. F. had not made statements of an intent to re-offend and had no sexual hallucinations or delusions.
The sex offender discharge summary from October 31, 2022 checked a box reading: "Mr. F. recognizes the need for emotional regulation and works to regulate emotions" but Dr. Lo-Rhoden did not include that assessment in her updated report. Id., p. 187. It noted he needed to work on his anger and "appropriately regulates sexual behaviors". Id. Mr. F.'s diagnoses while in the DOCCS sex offender treatment program were "adjustment disorder with mixed anxiety and depressed mood". Id., p. 229.[FN2]

Dr. Lo-Rhoden recounted an incident on January 7, 2025 where she said Mr. F. was directed to leave an area because he continued to be verbally aggressive to peers. Dr. Lo-Rhoden did not include in her report, however, a continuation of a note where it was said staff allowed Mr. F. to ventilate his feelings until he appeared to calm down. She did not include a reference to a note the following day where Mr. F. was reported as being calm, feeling better and appropriately venting about his feelings.
Mr. F. voluntarily began taking psychiatric medication while in the community in 2017. Dr. Lo-Rhoden agreed that Mr. was moving in the right direction with respect to helping himself but that more needed to be done. Mr. F.'s work in treatment programs, Dr. Scroppo opined, "are indicative of someone who has made a decision I want to do what I can do to improve myself, don't come back to prison and try to have as good a life as I can". Id., p. 253. He also opined that the fact that Mr. F. agreed to take psychiatric medications was another indication that his Antisocial Personality Disorder [discussed below] was declining.
Dr. Scroppo said that in a 2022 discharge summary from the State Department of Corrections and Community Supervision ("DOCCS") Mr. F. was noted as having a fair relapse prevention plan but said he had not seen it. Dr. Scroppo said he had conducted a "relapse prevention interview" with Mr. F. and described Mr. F.'s responses as adequate. Id., p. 325. Mr. F. identified "loneliness, sexual preoccupation, pornography and lying to others to manipulate them as triggers". Id., p. 326. Mr. F. said he would talk to others (family or peers) if these triggers occurred to seek help and also try to distract himself if triggers arose. Mr. F. has two sisters he has lost contact with who he said he hoped to re-contact. He expressed the hope to continue treatment if he were released to the community.
Mr. F.'s Age and Health
Dr. Kirschner said that people age out of sex offending but that Mr. F. has a lot of energy, is not disabled, acts in a similar manner as he always has and that age is not a significant issue in his case. Dr. Kirschner said sexual offending begins to generally decrease in the fourth decade [*9]of life, when a person is in their 30's.
In questioning by the court Dr. Lo-Rhoden agreed that the actuarial risk to offend reduces beginning at age 40 and then reduces again at age 60. She believed it was significant that Mr. F. offended at age 54. But she also agreed that the actuarial data about sexual offending and age didn't distinguish between offenders over the age of 60 who had offended recently [at age 54, for example] and offenders who had offended at a more remote time when the risk to re-offend was higher [for example, at age 25]. Dr. Lo-Rhoden also testified that Mr. F. had been arrested about 50 times after the age of 40, when antisocial behavior generally reduced.
Mr. F. has been diagnosed with an enlarged prostate for which he has been prescribed medication since 2009. Dr. Kirschner said he has been prescribed Flomax which he has refused to take on a number of occasions and given medication to help him urinate and defecate since he had an extremely difficult time doing that. When asked whether Mr. F. had reported to Dr. Lo-Rhoden that he had not been able to achieve an erection in 10 years, she said he had reported such an inability but she did not know the time frame.
Dr. Lo-Rhoden said it was not necessary to have an erection in order to sexually offend. She asserted that the lack of an ability to have an erection did not mitigate the risk to sexually re-offend for an offender like Mr. F. "It's an indication maybe of a lower sex drive, lower testosterone, and that's part of his aging as well. But I don't necessarily think that that mitigates risk". Id., p. 231. Dr. Scroppo said he thought it was reasonable to believe Mr. F. was unable to achieve an erection but that he could not be sure. He believed the issue was relevant to re-offense risk and called it "a marker of his overall lack of sexual interest". Id., p. 285.
When asked whether Mr. F. had made progress since his extensive masturbation in prison to the time at STARC when he was observed to be staring at a female staff member with no suggestion of any sexual component, Dr. Lo-Rhoden declined to describe this as progress. When asked whether the DSM states that ASPD declines beginning the fourth decade of life (in a person's 30's) she said this meant ASPD declines by age 40. She agreed that men have less testosterone, become physically weaker and become calmer as they age into their 50's, 60's and 70's. She also acknowledged that Mr. F. had few tickets as he aged. Dr. Lo-Rhoden agreed that some of Mr. F.'s antisocial traits are slowing down.
Dr. Scroppo opined that Mr. F.'s post-release supervision scheduled to last until 2037 would hopefully be protective because he would be monitored and connected to treatment programs.
The Static 99-R Actuarial Risk Assessment Instrument
The court takes judicial notice that the Static 99-R risk assessment instrument is the most widely used actuarial risk assessment instrument for sex offenders in use in the world today and is based on data concerning thousands of sex offenders. It measures "static" or unchanging variables but does not provide information about particular offenders or about "dynamic" risk factors which are subject to change. Scores are correlated with recidivism rates with higher scores indicating a higher risk to re-offend.
Dr. Kirschner testified that he does not heavily rely on this instrument. He said he had reviewed two Static 99-R scores, by the OMH case review team and by Dr. Lo-Rhoden. He initially didn't recall which he had relied on but then it appeared he had relied on the case review team's score. Dr. Kirschner later said he had relied upon a score of 6 [apparently reflecting the OMH case review team score]. Dr. Lo-Rhoden scored Mr. F. with an 8 on the instrument in her original and updated report but during her testimony said she had made a mistake concerning a [*10]prior criminal charge and now scored him with a 7. She said she had realized that mistake only in the past couple of days.
The instrument deducts 1 point if an offender's age at release is over 40 and 3 points if the offender's age at release is over 60. Mr. F. is almost 62 but Dr. Lo-Rhoden said his correct score reflected an age of over 40 and less than 60, a one point reduction. Mr. F. was released from prison to STARC (where he continues to be confined) after he turned 60. However, Dr. Lo-Rhoden said the date of release from prison to secure OMH confinement was not the operative date under the Static 99-R. She said the date was when his prison sentence had been scheduled to end and that, if he remained in prison after age 60, he would still not get credit for being over age 60, if his prison sentence had been scheduled to end before he turned 60. Dr. Lo-Rhoden did not know what the operative release date for Mr. F. was for this factor, however. She cited no specific authority from the coding manual for the manner in which she scored points for Mr. F.'s age under the instrument.
She scored Mr. F. with one point for having a male victim, based on his masturbating in prison in front of a non-consenting male correctional employee on one occasion. He was given a 0 for this item when the instrument was scored in DOCCS and also given a 0 for this factor by Dr. Scroppo. The record indicated that in this incident, in 1990, Mr. F. was directed to stop talking by a male officer and then said: "fuck you, copper", pulled out his penis, said "suck on this for a while" and walked away. Id., p. 200.
During the hearing, the State's attorney reiterated the State's long-held position that actuarial risk assessment instruments like the Static 99-R are not relevant with respect to whether a respondent has a Mental Abnormality under Article 10. They are only relevant during a dispositional proceeding where the court determines whether a respondent should be confined or released after a Mental Abnormality finding.
Dr. Scroppo disagreed with Dr. Lo-Rhoden's scoring of the Static 99-R and assigned a score of 4. Regarding Dr. Lo-Rhoden's assertion that Mr. F.'s score regarding his age should reflect the fact that he was over 40 years old but not over 60 years old, he said "[t]hat doesn't make any sense. It's [the instrument's] clearly designed to calculate risk when someone's at liberty". Id., p. 268. Dr. Scroppo said the coding manual provided and it only made sense to assess an offender's age upon their release to the community [which would make Mr. F. over 60]. Factoring in this modification would result in a score of 5. He said the coding manual for the instrument said "release" meant "when the offender is free in the community". Reading further from the manual he said release "may refer to release from court, jail, prison, psychiatric, hospital, or the like. Offenders are considered in the community if they're on parole, probation, or other types of community supervision". Id., p. 335.
Dr. Scroppo also said he disagreed that Mr. F. should be assessed 1 point for having a male victim, since the one incident of masturbation this score was based on, in Dr. Scroppo's view, was an aggressive rather than a sexual act. He acknowledged, however, that Mr. F. at one point during this incident said: "such my fucking Puerto Rican balls". Id., p. 318. Dr. Scroppo admitted he had referred to this incident in his report as a "sex offense" but said this was just to indicate it was a sexual incident. He said he did not believe it was a sexual offense.
Dr. Scroppo said the Static 99-R coding manual indicating that expressions of sexual behavior which were intended to be aggressive but not sexually enticing should not be scored under this factor. He was then unable to locate this provision in the manual. After a further review he located a passage in the manual which did not concern male victims but concerned [*11]exhibitionism [for which Mr. F. has not been diagnosed]. The manual, he said, required that exhibitionism be targeted to a specific victim. He then said the intent for such an offense would have to be sexual, but did not identify any coding rule which provided for that. He acknowledged that the definition of a sex offense under the manual meant a sex offense or criminal behavior with a sexual intent. He asserted Mr. F.'s masturbation in front of a male corrections officer was not "sexual misbehavior" because it was rather an expression of anger. Id., p. 331. He acknowledged the incident with the male officer was described in the ticket as a "lewd exposure". Id., pp. 331-332.
Dr. Scroppo said the predicted recidivism rate for offenders with a score of 4 was 9.2% over a period of 5 years. He said he believed the instrument was "mostly" relevant for the dispositional phase of an Article 10 proceeding rather than the trial stage although he said a respondent's age, which is included in the Static 99-R score, is relevant at an Article 10 trial. Id., p. 272.
Diagnoses
Antisocial Personality Disorder
All three witnesses diagnosed Mr. F. with Antisocial Personality Disorder ("ASPD") and described how he met the criteria for this diagnosis. Regarding the requirement for the diagnosis that there must be evidence of conduct disorder prior to age 15, Dr. Kirschner she Mr. F. was largely unsupervised as a child, began abusing drugs prior to age 15 and was involved in stealing a car at age 9 or 11. Dr. Kirschner cited Mr. F.'s extensive criminal history and history of non-compliance with parole. He noted that Mr. F.'s criminal history spanned the time from Mr. F.'s teenage years to the instant offense.
Dr. Kirschner said Mr. F. had never been gainfully employed and made money by selling illicit substances. He said Mr. F. had evidenced deceitfulness. Mr. F. has denied ever committing sex offenses. He is argumentative and easily angered. He is aggressive and irritable. Dr. Kirschner said Mr. F. lacks remorse and sees himself as a victim.
Dr. Lo-Rhoden opined that Mr. F.'s ASPD diagnosis was current and noted his angry and hostile responses to staff and peers at DOCCS and STARC. Dr. Scroppo said Mr. F. was in a "downward trajectory" with respect to ASPD [meaning the manifestations of the disorder were decreasing]. Id., p. 251. He said Mr. F. had a traumatic childhood which might help explain his diagnosis, saying he had seen his mother shoot someone, was molested as a child, that his father left his life at age 4, that Mr. F. moved back and forth between the United States and Puerto Rico and lacked real adult supervision. He was also exposed to domestic violence in his home. ASPD generally declines with advancing age. Dr. Scroppo said Mr. F.'s advancing age, decreased disciplinary infractions and interest in psychiatric treatment all indicated a decline in his ASPD. He said that if Mr. F. was "severely antisocial" the manifestations of his ASPD would not be declining. Id., p. 255. Dr. Scroppo said the phrase "fourth decade of life" with respect to when ASPD began to decline was not artfully worded but was generally understood to begin at age 30. 
Dr. Scroppo said that impulsivity may be limited to certain aspects of a person's life and that Mr. F. has not demonstrated impulsivity with respect to his sexual offending. He argued that Mr. F.'s reduced rate of prison disciplinary infractions was indicative of a reduction in his ASPD. He said that from 1988-2003 he received about 5 tickets per year. From 2009 to 2011 he said Mr. F. received 2 tickets. Dr. Scroppo said Mr. F.'s substance use disorders exacerbated or interacted with his ASPD.
Psychopathy
Dr. Kirschner and Dr. Lo-Rhoden assigned the condition of psychopathy to Mr. F. Dr. Scroppo did not assign this condition. Both Dr. Lo-Rhoden and Dr. Scroppo scored the Psychopathy Checklist Revised (the "PCLR"). The court takes judicial notice that this instrument is typically scored by psychologists to determine if a person has the condition of psychopathy. Dr. Kirschner did not score the instrument since, he said, he did not think that appropriate because he was not able to interview Mr. F. but testified that he agreed with Dr. Lo-Rhoden's score. Dr. Lo-Rhoden scored Mr. F. with a 33.7. Dr. Kirschner said the instrument has a possible error rate of 2.5. Dr. Kirschner did not agree with Dr. Scroppo's score which was lower. Dr. Scroppo testified that 30 is the typical cut-off above which psychopathy will be found. Dr. Lo-Rhoden testified about how she scored each of the 20 parameters of the PCLR. She said a score of zero meant a trait did not apply. Dr. Scroppo explained that a score of 2 meant an item was a "really good fit" and a score of 1 indicated an item was a moderate but not great fit. Id., p. 261.
Dr. Kirschner gave as one example of his agreement with Dr. Lo-Rhoden's score the fact that she scored Mr. F. with a 2 for pathological lying. He cited Mr. F.'s use of aliases, giving parole a false address and reporting to parole that he lived at an address which was a vacant lot. Dr. Kirschner acknowledged that Mr. F. was homeless during that time, but said he should have reported to parole that he was homeless, rather than that he lived at an address which was a vacant lot.
Dr. Lo-Rhoden scored Mr. F. with zero for glibness and superficial charm. She scored 2 for a grandiose sense of self-worth. She noted his offending, attempt to control conversations, claim his version of the facts is the only accurate one and his plans to make a documentary about his life, believing it was unique. She scored him with a 2 on stimulation and proneness to boredom based on his substance abuse and disciplinary violation history. She scored him with a 1 for pathological lying, based on inconsistent statements he has made. She scored 2 for conning/manipulative. She cited his tricking correctional staff with requests for assistance and then masturbating in front of them and selling fake marijuana. She scored him with a 2 for lack of remorse or guilt. She scored him with a 1 for shallow affect which she said was based on the fact that Mr. F. has a narrow range of affect, primarily being hostile and angry.
She scored Mr. F. with a 2 based on being callous and having a lack of empathy. She said his descriptions of his offenses were matter-of-fact and that he had no regard for his victims. She scored him with a 2 for a parasitic lifestyle. He has primarily supported himself with illegal activities and been homeless. She scored him 2 for poor behavioral controls based on his offense history. She scored Mr. F. with a 2 for promiscuous sexual behavior. She cited his prison sexual disciplinary infractions, impersonal sex in the community and what she said was his history of engaging with prostitutes or going to sex shops. She did not score Mr. F. for early behavioral problems because she said she lacked adequate records on that issue. She scored him with a 1 for the lack of realistic long-term goals. She scored 2 for impulsivity and 2 for irresponsibility. She noted Mr. F. did not have any contact with his adult daughter. She scored him with a 2 for failure to accept responsibility for his actions.
Dr. Lo-Rhoden said that psychopathy was distinguished from ASPD because of psychopathy's interpersonal and affective components. A lack of empathy, a matter-of-fact demeanor regarding emotionally laden issues, a shallow affect and grandiosity characterize the condition. Dr. Lo-Rhoden did not recite her score for many short-term marital relationships, [*12]although she apparently provided a score. She scored him with 2 for juvenile delinquency. She scored him with a 2 for revocation of conditional release. She scored him with a 2 for criminal versatility.
Dr. Scroppo did not assign the condition of psychopathy to Mr. F. The personality inventory he administered to Mr. F. (discussed below) indicated to him that psychopathy was not present. He described psychopathy and ASPD as "largely overlapping for the most part" but that psychopathy was additionally manifested by glibness, attitude and emotional manipulation. Id., pp. 257-258. Dr. Scroppo scored the PCLR at 26.7. He said he had made an error in his report by not adding numbers correctly but it didn't change his conclusion. The PCLR is divided into two factors. The first is interpersonal manipulativeness and narcissism which are the psychopathic component. The second is antisocial behavior. In both his and Dr. Lo-Rhoden's score, the second component was much higher than the first. Dr. Scroppo said Dr. Lo-Rhoden's PCLR score relied on data from the OMH case review team which dated back 45 years and was too old to appropriately use.
Dr. Scroppo initially provided an extended explanation for why he did not assign a score of 2 for conning and manipulation, as Dr. Lo-Rhoden had. Dr. Scroppo cited examples from the PCLR scoring manual for behaviors which were indicative of this trait, said Mr. F. did not have any and said Dr. Lo-Rhoden's score was based on deceiving a corrections officer prior to masturbating and selling fake marijuana. He asserted these two examples did not justify assigning a 2 for this trait. He also said Mr. F.'s criminal history did not justify assigning a 2 for that factor.
On cross-examination, however, Dr. Scroppo admitted that he had provided a score of 2 on this factor, the same score as Dr. Lo-Rhoden, and that his earlier testimony on that subject had been a mistake. He said that he now realized he agreed with Dr. Lo-Rhoden's score because he had concluded that while living on the street and being homeless over time Mr. F. had been deceitful to get things he wanted. On cross-examination he also compared the scores he provided with Dr. Lo-Rhoden's higher scores but generally did not explain the differences.
Dr. Scroppo also said Dr. Lo-Rhoden's score of 2 for having a grandiose sense of self-worth was not justified. He said Dr. Lo-Rhoden cited Mr. F.'s desire to make a documentary about his life and cutting people off when they were speaking but that Mr. F. actually had low self-esteem and did not have a grandiose sense of self-worth. Dr. Scroppo said Mr. F. had been psychiatrically assessed in DOCCS 11 times but never assigned the condition of psychopathy.
Dr. Scroppo said that "[t]he DSM-5-TR [the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, Text Revision] strongly suggests that they're [ASPD and psychopathy] essentially synonymous with each other. In various sections it so states". Id., p. 265. Addressing the relationship of psychopathy with the Article 10 requirement that a respondent have serious difficulty controlling sexually offending behavior, Dr. Scroppo testified:
There is no research that shows the psychopathy is correlated with the inability to control ones behavior. In fact, generally the opposite is thought of. People high in psychopathy tend to be able to control themselves to do the manipulation and the conning and all of that. Usually takes quite a great amount of self-control. So ironically, psychopathy is likely related to having volitional control. But there's no research to show any connection between the two things. Id., p. 266. Substance Use Disorders
Dr. Kirschner diagnosed Mr. F. with cannabis and cocaine use disorder. Dr. Kirschner [*13]said Mr. F. began smoking marijuana at age 9 and has used cannabis and cocaine throughout his life. Dr. Lo-Rhoden said his marijuana use began at age 9 and that he used marijuana daily beginning at age 15 and began sniffing cocaine at age 15. Dr. Kirschner noted daily cocaine use but did not assign a specific time frame for that.
Dr. Kirschner described the diagnoses as "mostly in a controlled environment". Id., p. 33. Mr. F. had a substance use related prison infraction on June 14, 2021. Dr. Kirschner was initially confused about the nature of this violation and said Mr. F. had admitted to smoking marijuana. After clarifying questions, Dr. Kirschner testified that the violation occurred when Mr. F. refused to provide a urine sample. He then acknowledged that his testimony that Mr. F. had admitted smoking marijuana did not concern this disciplinary infraction but was a general statement with no specific time indicated. Dr. Kirschner then said Mr. F. had admitted to using marijuana while confined but could provide no time frame any such admission concerned.
When asked whether there was "evidence that the Respondent was under the influence of any of these substances when he committed any his offenses", Dr. Kirschner replied: "Not to my knowledge". Id., p. 38.
Dr. Lo-Rhoden diagnosed Mr. F. with the same disorders. She cited his significant history of drug offenses despite sanctions. She reported that he had said he had used marijuana while confined at DOCCS but provided no time frame. Dr. Scroppo also assigned these diagnoses and said they were in remission in custody. He noted that Mr. F. had not reported any desire to use drugs. Dr. Scroppo opined that Mr. F.'s substance abuse did not relate to his sexual offending, saying that a connection had arisen only once, during the instant offense.
Psychological Testing
Dr. Scroppo administered the "Personality Assessment Inventory" which he analogized to a complete blood count assessing personality and psychiatric disorders and personality features. He said Mr. F. was "psychiatrically stable" and did not suffer from any major mental illness. Id., p. 256. He testified that Mr. F.'s antisocial behavior scale on the instrument was elevated. But he said his "egocentricity" and "stimulus seeking" components were not, which he said was an indication Mr. F. did not have psychopathy.
The Dramatic Improvement in Mr. F.'s Courtroom Demeanor
This court has been presiding over appearances in this case for a significant period of time. Initially, Mr. F. was so belligerent, loud and oppositional in the courtroom that it was almost impossible to convey information to him. His conduct during this period was never verbally or physically threatening and he did not use profanities. But the grievances he relayed, in part due to what he perceived as the unfairness of the Article 10 process, were expressed in a manner which made it almost impossible to have an informed discussion.
His conduct has improved dramatically, however, during the past roughly 6 months. In part, this appears to be based on a constructive relationship with his attorney. Mr. F. during the trial at a few points blurted out disagreements with the testimony of trial witnesses. But these inappropriate comments were not consistent and when told to stop talking he readily complied. The court's observations are consistent with what has been observed at STARC. They are also consistent with the fact that, while Dr. Scroppo was initially unable to complete an evaluation due to Mr. F.'s belligerent behavior, Mr. F.'s improved demeanor made that possible as his behavior improved.
Mental Abnormality Conclusions
Dr. Kirschner opined that Mr. F. had a Mental Abnormality under Article 10. He cited [*14]Mr. F.'s long offending history, his 22 sexual disciplinary infractions in prison, which he said exceeded any amount he had ever encountered and his attempt to rape a female corrections officer, which resulted in a conviction for the non-sexual offense of Assault in the Second Degree. He described Mr. F. as a "chronic" sexual offender. Id., p. 39. Mr. F. committed the instant offense at age 54. Sex drive decreases with age and Mr. F. has "tapered off" with respect to sexual offending. Id., p. 40. He also cited the STARC "staring" incident and the fact that Mr. F. had written two "love letters" to a correctional staff member following his 1997 assault of the corrections dental hygienist.
Dr. Kirschner said Mr. F.'s conditions together predisposed him to commit sexual offenses and that his conclusion was supported by Mr. F.'s prison sexual disciplinary infractions. Mr. F. hasn't admitted to any of his sexual offenses and has no relapse prevention plan. According to Dr. Kirschner: "He [Mr. F.] hasn't — as far as I can see, gained any benefit from sex offender treatment" and still manifests the same tendencies he had when he offended. Id., p. 46. "[T]he past remains current". Id.
Dr. Kirschner opined that he did not have significant differences with Dr. Scroppo regarding Mr. F.'s diagnoses. Dr. Kirschner said Dr. Scroppo had determined Mr. F. did not have a Mental Abnormality because Dr. Scroppo concluded that Mr. F.'s only relevant diagnosis or condition was ASPD which had been found to be legally insufficient, standing alone, to result in a Mental Abnormality. When asked by the court if there was a way to understand Mr. F.'s long period of time between 2001 and 2017 without being known to have committed any sexual offense, Dr. Kirschner said this would be impossible to understand absent questioning Mr. F. about it during an interview.
Dr. Kirschner opined that Mr. F.'s general belligerence was related to his propensity to commit sexual offenses because both tendencies manifest impulsivity, feeling justified and feeling himself to be a victim. When asked how his Mental Abnormality conclusion was supported by the fact that Mr. F. had one sexual offense during the past 24 years, Dr. Kirschner said: "History is the most important determinant of future behavior". Id., p. 102.
Dr. Lo-Rhoden said Mr. F. was predisposed to commit sexual offenses by virtue of his ASPD and psychopathy. She said his substance use disinhibited his behavior. Mr. F. feels entitled to take what he needs and lacks behavioral controls. Regarding serious difficulty, she referred to his long sexual offense history and noted that only about 1% of juvenile sex offenders go on to commit adult offenses. She also noted that sexual disciplinary infractions in prison were rare. Dr. Lo-Rhoden said the risk of sexual offending declines beginning at age 40 but that Mr. F. had offended at age 54. She opined that Mr. F.'s long period in the community without sexually offending could be seen as analogous to a person with a substance use disorder who remains abstinent for an extended period but then goes back to use substances at a particular time.
Dr. Scroppo testified that the only diagnosis or condition he found which could be related to sexual offending was ASPD, which he said was declining. ASPD alone is legally insufficient to allow a Mental Abnormality finding to be made. He said that if Mr. F. had a predisposition to commit and serious difficulty with respect to committing a sexual offense this would have manifested himself while he was in the community for 14 years without offending. He said substance abuse, while it disinhibited behavior, would not by itself cause sexual offending. He said the denial of sexual offending and a lack of victim empathy in actuarial studies had been demonstrated to have no relationship to recidivism.
Dr. Scroppo described Mr. F.'s belligerence as a protective front. "He's older, he's frail, he has medical problems, and he's in a dangerous environment and he's also had a history of trauma. So, I think his initial way of protecting himself is to keep people at a distance by presenting this belligerent, irritable, loud presentation". Id., p. 292. He said he had built trust with Mr. F. over time and opined that Mr. F.'s belligerence was not a fundamental part of his sexual offending.
CONCLUSIONS OF LAW [FN3]

There was no argument at the trial that Mr. D. was not a "Detained Sex Offender" under Article 10, a necessary determination to subject him to sex offender civil management. See MHL § 10.03 (g). The State's evidence indicated that he was serving a sentence for the instant Article 10 offense when the petition was filed. The trial concerned the question of whether Mr. F. suffers from a Mental Abnormality. A Mental Abnormality is defined under the statute as "a congenital or acquired condition, disease or disorder that effects the emotional, cognitive or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct" MHL § 10.03 (i).
Diagnoses and Conditions Credited
All three doctors diagnosed Mr. F. with ASPD and the court credited that diagnosis. Dr. Lo-Rhoden assigned Mr. F. the condition of psychopathy based on her score of 33.7 on the PCLR. Dr Kirschner testified that he agreed with the assignment of that condition. Dr. Scroppo did not assign this condition based on his lower scoring of the PCLR and the results of the Personality Assessment Inventory.
This court is obviously not an expert in the scoring of the PCLR. In the court's view, however, Dr. Lo-Rhoden's score on the instrument was generally accurate and the court credited that score and the assignment of the condition of psychopathy by the two State experts. Dr. Lo-Rhoden's detailed factor-by-factor explanation of the scores she provided generally seemed to reflect Mr. F.'s condition. Dr. Scroppo did not provide a detailed explanation of his scoring decisions. He was also simply wrong in one part of his testimony about his critique of Dr. Lo-Rhoden's scoring where he first argued that Dr. Lo-Rhoden's assignment of 2 points for being lying and manipulative was wrong and explained why he disagreed with that conclusion, then later said he had provided the same score, but then explained his identical score with a different rationale.
The court also credited the conclusion of each expert that Mr. F. had cannabis and cocaine use disorder. The disorder appears to be in remission in a controlled environment. The court also concluded, however, that these disorders were not factors in his sexual offending, as discussed further below.
There is Not Currently Clear & Convincing Evidence Mr. F. Has Serious Difficulty Controlling His Sexually Offending Behavior
If this proceeding had occurred in 2003 when Mr. F. was released from prison after his extraordinary record of prison sexual disciplinary infractions and two sexual offenses this court might have concluded Mr. F. had serious difficulty controlling his sexually offending behavior. [*15]Mr. F.'s sexual offense history today, however, with a single exception in which he was convicted of attempting to touch the sexual or intimate parts of a 14-year-old girl in 2018 exclusively concern conduct more than 24 years ago.
Mr. F.'s sexual offense history is obviously egregious. It included not only serious sexual crimes, like his assault of a dental hygienist in prison, but 22 sexual offense disciplinary infractions between 1988 and 2001. What the State was required to prove, however, was that Mr. F. currently has serious difficulty controlling sexually offending behavior. In the court's view, that was not proven.
A period of about 17 years elapsed between Mr. F.'s last prison sexual disciplinary infraction in 2001 and the instant offense in 2018. That is, for about 17 years in prison, jail and in the community there is no evidence Mr. F. every committed or attempted to commit any sexual offense. A period of about 15 years elapsed between Mr. F.'s initial release to the community in 2003 and the instant offense in 2018 although Mr. F was also confined numerous times in prison or jail during that period. Dr. Lo-Rhoden agreed Mr. F. had been in the community dozens of times during that span. During that 15 year period in which Mr. F. spent significant time in the community there is no evidence he committed or attempted to commit any sexual offense. During the past 24 years — from 2001 until 2025 — during which Mr. F. has been in prison, jail, OMH custody or in the community he is known to have attempted to commit one sexual offense.
During Mr. F.'s many years in the community following his release from prison in 2003 he was arrested 55 times, 35 times for drug crimes. He also committed numerous theft offenses. Mr. F. in the community from 2003 -2018 engaged in an ongoing pattern of criminal activity in which he manifested a blatant disregard for rules and norms and ASPD. The phrase "serious difficulty in controlling" sexually offending behavior is not defined under Article 10. It has also never been defined in controlling case law. There is no requirement that "serious difficulty" must be evident within any particular time. An offender may go a week, a month, a year or a decade with no evidence of sexual offending and yet be found to have such serious difficulty.
A few things about Mr. F.'s long period in the community without evidence of sexual offending, however, are notable. First, is the duration of the period in which there was no indication of sexual offending. Second was the absence of any supervisory regime which was deterring Mr. F. from committing sexual offenses. He was on parole but violated parole on multiple occasions. Third was his extensive drug use. Drug use can reduce inhibitions on sexual offending. It apparently did not do so for Mr. F., however, for 15 years. Mr. F. was freely violating rules and norms throughout this entire time. His criminality since 2003 however, with one exception, has not arisen with respect to sexual offenses. It has primarily been manifest in theft and drug crimes. Were there an analogue to Article 10 for theft or drug crimes, Mr. F. might qualify. In the court's view, however, he is not currently demonstrating serious difficulty in controlling sexual offending under Article 10.
Mr. F.'s long time in the community without re-offending is in contrast to the far more common scenario of an Article 10 offender who is subject to the statute after an extended period of incarceration in which no sexually offensive behavior occurred. In such circumstances, there is a reasonable argument that a respondent's behavior while confined might not reflect behavior in the community. Here, in contrast, there was an extensive period in which Mr. F. was in the community without offending although he obviously then did offend in 2018.
Mr. F.'s Diagnoses Barely Qualify Him for Article 10
Mr. F. has no paraphilic or sexual disorder. He has no major psychiatric disorder. He is not sexually preoccupied. He does not use sex as a coping mechanism. He does not have any deviant sexual arousal. He evidences no hostility towards women. As discussed further below, at this point he apparently cannot even achieve an erection. In this court's view the diagnoses and conditions it credited at best barely qualify him for Article 10, presuming, as discussed further, they qualify him at all. Article 10 is a statute focused on the need for confinement or intensive supervision in order to provide psychiatric treatment to reduce an offender's risk to re-offend. Mr. F.'s only relevant psychiatric condition, however, is ASPD, along with the closely associated condition of psychopathy. ASPD, as has often been observed in Article 10 case law, is a condition about 80% of prison inmates have.
In State v. Donald DD.& Kenneth T., 24 NY3d 174 (2014) the Court's four judge majority held "evidence that a respondent suffers from antisocial personality disorder cannot be used to support a finding that he has a mental abnormality . . . when it is not accompanied by any other diagnosis of mental abnormality." 24 NY3d at 177. Donald DD. also addressed the issue of psychopathy in a footnote which the majority inserted following their recitation that both of the State's expert witnesses had diagnosed the Respondent with ASPD:
In addition, both experts opined that Donald DD. suffered from an extreme form of ASPD known as psychopathy. However, they did not testify that this finding materially affected their conclusions regarding Donald DD.'s mental abnormality under Article 10. n. 3.
Thus, the Court found both that the assignment of the condition of psychopathy [which is not a formal diagnosis] when combined with ASPD, did not result in a valid Mental Abnormality finding and that psychopathy was just "an extreme form of ASPD". That latter conclusion reflects how psychopathy is defined in the DSM-5-TR.[FN4]
Dr. Scroppo made the same point during the trial, saying "[t]he DSM-5-TR strongly suggests that they're [ASPD and psychopathy] essentially synonymous with each other. In various sections it so states". In the period following Donald DD., as this Court outlined in its decision in State v. Jerome A., 48 Misc 3d 1229 (A) (2015), 2015 NY SlipOp 51303 (U) * 9 (Sup Ct, NY County 2015) "[t]he clear weight of [trial court] authority . . . held that where a Respondent is diagnosed with ASPD and psychopathy but no sexual disorder, Donald DD. requires the petition's dismissal". Those are the only relevant conditions Mr. F. has.
Post-Donald DD. cases, however, also held that where a respondent had ASPD along with some other condition, that was sufficient to satisfy the Donald DD. rule. The analytic problem is that every respondent with ASPD can be assigned some additional descriptor relevant to sexual offending. Offenders can have other diagnoses, but can also be described as suffering from psychopathy, being "sexually preoccupied", having a deviant sexual arousal to non-consent, sadism or other abnormal preferences or suffering from alcohol or substance use disorders which promote sexual offending. Determining which such descriptors are sufficient under Donald DD. has never been clear.
Appellate division cases following Donald DD. have often upheld Mental Abnormality judgments where a respondent had ASPD plus some "condition" which did not rise to the level [*16]of a diagnosis. Donald DD. found the respondent's diagnosis of ASPD invalid even though he had also been assigned the condition of psychopathy. In State v. Jerome A., this Court, in an extended opinion, dismissed an Article 10 petition after a probable cause hearing. This court's determination was based both on the fact that the diagnosis by the State's sole expert witness, Dr. Charder, that Mr. A. had ASPD and psychopathy was the same diagnosis rejected as not meeting Article 10 requisites by the Court of Appeals in Donald DD. and because this court did not find Dr. Charder's testimony otherwise credible or sufficient to establish a Mental Abnormality.[FN5]

In State v. Jerome A., 137 AD3d 557 (1st Dept 2016), however, the First Department reversed this Court's dismissal. The Court held that "issues concerning the viability and reliability of the respondent's diagnosis are properly reserved for resolution by the jury unless the respondent's evidence is deficient" and "the expert's testimony at the [probable cause] hearing was not so deficient as to warrant dismissal of the petition at this early juncture" (citations omitted). The Court also held that because the State proffered the diagnosis of ASPD plus psychopathy, rather than ASPD alone, the evidence was legally sufficient under Donald DD.[FN6]

This court continues to respectfully disagree with appellate rulings which have held that ASPD along with psychopathy are sufficient Mental Abnormality diagnostic predicates under Donald DD but is obviously bound to follow those rulings. In this case, in the court's view, the only diagnoses or conditions relevant to Mr. F.'s sexual offending were ASPD and psychopathy.
As Dr. Scroppo testified, moreover, there is no evidence psychopathy when paired with ASPD results in less volitional control than ASPD alone. "Serious difficulty" in controlling sexually offending behavior under Article 10 requires a lack of volitional control. But in fact, as Dr. Scroppo testified, there is a good argument that psychopathy when paired with ASPD results in greater volitional control than ASPD alone. This court initially dismissed the Jerome A. case, in part for precisely that reason. The State's expert in that case testified that Mr. A.'s psychopathy provided him with enhanced volitional control, negating Article 10's serious difficulty requirement.
The "Strong" or "Particular Tendency" Sexual Component Rule
In State v. Dennis K., Anthony N. & Richard TT., 27 NY3d 718 (2016) the Court of Appeals held that the combined diagnoses of ASPD and Borderline Personality Disorder ("BPD") with respect to respondent Anthony N. were sufficient Mental Abnormality predicates because the BPD diagnosis had a "strong sexual component" and resulted in a predisposition to commit sex crimes. 27 NY3d at 743-744. see also State v Anthony B., 180 AD3d 688, 690-691 (2nd Dept 2020) (ASPD plus Narcissistic Personality Disorder ("NPD") sufficient to constitute Mental Abnormality where NPD had a "strong sexual component" and was "linked" to the predisposition to commit sex offenses.)
In State v. Timothy R., 168 AD3d 146, 151 (2nd Dept 2018) the Second Department held that in order for an Article 10 diagnosis for an offender with ASPD to be sufficient, the State must prove "another diagnosis that suggests a particular tendency to commit a sex offense as defined by the statute". Citing Donald DD. (emphasis added; additional citation omitted). Unlike the "ASPD plus something else" rulings, these formulations attempted to articulate a principle which defined the conditions which might satisfy the diagnostic predicate requirement.
Mr. F.'s Substance Abuse Diagnoses Are Not Valid Article 10 Diagnostic Predicates
It is also clear, in this court's view, that under controlling appellate authority, Mr. F.'s diagnoses of cannabis and cocaine use disorder (along with ASPD) are legally insufficient Article 10 diagnostic predicates. They clearly do not suggest a "particular tendency" to commit a sexual offense. Thus, Mr. F. in this case has ASPD (a clearly insufficient Mental Abnormality predicate) plus psychopathy (a Mental Abnormality predicate which, in this Court's view, was rejected by the Court of Appeals when paired with ASPD but has been accepted when paired with ASPD by the First Department).
Mr. F.'s substance abuse began when he was 9 years old and continued throughout his life. He was convicted of dozens of drug offenses. His sexually offending conduct has also spanned a period from age 15 to age 54. What is striking, however, is that during this entire lifespan, with one possible exception, there has never been any known association between Mr. F.'s drug abuse and his sexual offending other than Dr. Scroppo's observation that Mr. F. had smoked a little weed during his initial sexual offense at age 15. He has freely abused drugs in [*17]the community and not sexually offended. On the other hand, during the period ending in 2001, he engaged in numerous sexual offenses with no evidence of any association with substance abuse.
The one possible exception was the 2018 instant offense. Dr. Kirschner, however, who was fully familiar with the details of that crime, said he was not aware of any sexual offense Mr. F. committed while under the influence of drugs. Drs. Lo-Rhoden and Scroppo, however, did testify that Mr. F.'s instant offense in 2018 was committed while he was under the influence of cocaine or cocaine withdrawal. Notably, this conclusion appears to have come only from Mr. F.'s self-report and has not been corroborated with other evidence. Dr. Lo-Rhoden did not credit Mr. F.'s report of this incident in other respects. But she credited Mr. F.'s report that he had been using drugs. The two doctors reviewing the same records also couldn't agree on what the drug issue was, with Dr. Lo-Rhoden describing drug use and Dr. Scroppo cocaine withdrawal. Presuming Mr. F. was under the influence of drugs on this occasion, however, this would apparently be the one time in his life when drugs and sex offending intersected in a significant way. In the court's view, Mr. F.'s substance abuse diagnoses, which are now in remission in a controlled environment, have not evidenced either a "strong sexual component" or demonstrated a "particular tendency" to commit a sexual offense.
Mr. F.'s offending has been driven by his antisociality. The vast majority of his antisocial behavior has manifested itself in non-sexual criminality and other violations of rules and norms. In the past 24 years, Mr. F. has been convicted of attempting to commit one sex crime. Even Dr. Kirschner, however, has commented on the thin reed ASPD provides for concluding that a Mental Abnormality exists under Article 10. He said this during another recent bench trial this court presided over:
Regarding ASPD, Dr. Kirschner agreed that up to 80% of offenders in prison can be diagnosed with the disorder. He then allowed: "That's why it is useless. It doesn't really say anything about an individual. . . . Antisocial covers a heterogenous group of people. I have never been in favor of the diagnosis personally". State v. Jeremiah D., 83 Misc 3d 1272 (A) (Sup Ct., NY County 2024) citing trial transcript, p. 38.
As a matter of substantive due-process serious difficulty evidence allowing for civil management "must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case. Donald DD., 24 NY3d at 189 (quotation omitted, emphasis added in Donald DD.) Mr. F.'s behavior in the community since 2003 demonstrated he was such a dangerous but typical recidivist.
Mr. F. is No Longer Predisposed to Commit Sexual Offenses
Like the term "serious difficulty" the requirement that an offender be "predisposed" to commit a sexual offense in order to be subject to civil management has never been defined in the Article 10 statute or appellate case law. This court has outlined why it believes Mr. F. no longer has serious difficulty controlling his sexually offending behavior and why the diagnosis and condition it credited as being relevant to Mr. F.'s sexual offending: ASPD plus psychopathy, has been held legally sufficient by the First Department. But the court also believes Mr. F. is no longer "predisposed" to commit a sex offense.
A "predisposition" has been defined as "the state of being likely to behave in a particular [*18]way", here, a likelihood of sexual offending.[FN7]
Less exacting definitions of the term also exist. Thus the term "predisposed" has also been defined as "to make [a person] susceptible" to certain conduct [FN8]
or "to cause someone to be more likely to behave in a particular way or to be affected by a particular condition".[FN9]
Mr. F. likely met this definition at earlier points in his life. The court today does not believe he meets this definition for the reasons outlined earlier together with the following six related points.
Mr. F. Appears to be on a Significant Positive Trajectory Regarding His Risk
Dr. Lo-Rhoden agreed that Mr. F. is on a positive trajectory. STARC treatment records indicate that while Mr. F. is still being belligerent, his oppositional behavior is reducing. It also seems clear that this behavior is reducing because Mr. F. is exercising greater volitional control over his actions. Mr. F. voluntarily began taking psychiatric medication in 2017. The court agreed with Dr. Scroppo's assessment that Mr. F. is motivated to improve his behavior and stay out of prison. ASPD tends to reduce with age and Mr. F.'s offending has been driven by his ASPD.
The court has also noted an extraordinary improvement in Mr. F.'s behavior in the courtroom. The improvement in Mr. F.'s demeanor has not been long-lasting. It is always possible, moreover, that a respondent might act to temporarily improve his behavior as a tactic when an Article 10 case is proceeding. No one has suggested, however, that Mr. F.'s recent improved conduct has been feigned. Indeed given his prior apparently uncontrollable belligerent conduct it is difficult to see how he could behave more appropriately as a ruse.
Mr. F.'s Advancing Age Reduces His Risk to Re-offend
All of the experts agreed that the actuarial risk to re-offend declines beginning at age 40 and then declines again beginning at age 60. As reflected in the scoring of the Static 99-R, which is based on data concerning sex offender re-offense rates, the decline at age 60 results in a point reduction (2 points) which is twice as high as the reduction in points assigned at age 40 (1 point). Mr. F. will shortly be 62 years old. 
The actuarial risk to re-offend data do not distinguish between offenders who are healthy or disabled. There are two important caveats to this data. The first is that such data obviously do not provide any information about an individual offender like Mr. F. The second is that Mr. F.'s last sex offense occurred when he was 54, at a time when his risk to re-offend was already expected to decline. That fact then leads to the argument that such data are particularly uninformative with respect to Mr. F. On the other hand, however, the data on re-offense rates for aging defendants, as Dr. Lo-Rhoden acknowledged, do not distinguish between offenders who offended in the relatively recent past like Mr. F. and offenders who have not offended for a longer period of time. In the court's view, Mr. F.'s age, independent of any other consideration, reduces his risk to re-offend and is a relevant consideration.
Mr. F.'s Significant Sexual-Related Health Problems Reduce His Risk to Re-offend
Mr. F. has a long-standing prostate problem. He apparently is unable to achieve an [*19]erection. In the court's view, that is relevant. Mr. F. obviously is still capable of sexually offending. The instant offense did not require an erection. But, in the court's view, his apparent inability to achieve an erection has reduced his risk. It would make it more difficult to commit certain crimes. Perhaps more importantly, it is related to what two of the experts testified was a reduction in his sex drive. There is no evidence Mr. F. is sexually preoccupied. There is no evidence he is focused on sex at all at this point in his life.
Mr. F.'s Completion of Sex Offender Treatment Has Reduced His Risk to Re-offend
Mr. F.'s risk to re-offend, in the court's view, has been reduced because of his completion of sex offender treatment. Both of the State's experts described this as a positive thing, although they also opined it was of little value because Mr. F. had not addressed his prior offenses or the triggers which might cause him to re-offend. All of the experts, in the courts' view, provided important opinions regarding Mr. F.'s progress in sex offender treatment. He is clearly engaged in treatment and appears to be motivated to improve. On the other hand, he still obviously has significant work to do with respect to understanding what has triggered his sexual offending and developing strategies to avoid those triggers. His continued denial of his sexual offending is also problematic because without at least acknowledging that offending, it is difficult to develop strategies to avoid future offenses.
Mr. F.'s Continued Parole Supervision Will Reduce His Risk to Re-offend
Mr. F. will be on parole supervision until 2037. In the court's view, that is also relevant and will likely be a protective factor for Mr. F., as Dr. Scroppo testified. The court must determine here whether Mr. F. has serious difficulty controlling his sexually offending behavior. But that serious difficulty assessment must reflect the real-life circumstances Mr. F. would encounter upon being released. He will be supervised on parole for another 12 years. The court takes judicial notice that sex offender parole is usually more stringent than parole for non-violent offenders and often includes a requirement for sex offender treatment. It is far less stringent than being placed on Strict and Intensive Supervision and Treatment in the Community under Article 10. But, in the court's view, Mr. F.'s continued parole supervision will likely help reduce his risk to re-offend.
Of course, parole supervision did not deter Mr. F.'s criminality following his release from prison after a non-sexual offense conviction beginning in 2003. In the court's view, however, Mr. F.'s is at a significantly lower risk of offending than he was twenty years ago and given his progress in reducing belligerent behavior may be more likely to comply with parole conditions than he was previously. He also seems motivated to continue treatment and parole should help him connect with that.
Mr. F.'s Static 99-R Score Indicates He is Unlikely to Re-offend
The court does not believe Mr. F.'s Static 99-R score is a significant consideration in this case but does believe it has some relevance. The State and many courts have reached a different conclusion: that the instrument is only relevant with respect to the decision about whether an offender found to have a Mental Abnormality should be confined or placed on supervision in the community. As the court understands the argument, Mental Abnormality determinations concern whether a unique individual is predisposed to commit and has serious difficulty in controlling his behavior with respect to committing a sexual offense. Actuarial data do not speak to this question.
The court believes such scores are relevant for the following reason. A respondent's risk to re-offend is relevant to whether a respondent has serious difficulty in controlling sexually [*20]offending behavior. Actuarial data which indicates the rate at which offenders with the same characteristics have re-offended has some relevance in determining an offender's risk. Relevance is a minimal standard. 
The court disagreed with Dr. Lo-Rhoden's score on the Static 99-R. It was obvious that she should have deducted 3 points for Mr. F.'s age at whatever time he may be released from custody rather than the 1 point she deducted. Mr. F. will be over 60 at whatever time he may be released to the community. The court agreed with Dr. Scroppo's analysis of why a minus 3 was the correct score with respect to Mr. F. age. On the other hand, the court disagreed with Dr. Scroppo's failure to add 1 point to Mr. F.'s score for having a male victim for the reasons Dr. Lo-Rhoden explained. The court thus believes Mr. F. should have been scored with a 5 on the instrument, rather than Dr. Lo-Rhoden's corrected score of 7 or Dr. Scroppo's score of 4. The Static 99-R coding manual contains standard recidivism rate tables for the "routine sample" of sex offenders subject to the instrument. Dr. Scroppo testified that the 5 year recidivism risk for offenders with a score of 4 was 9.2% The court takes judicial notice that the 5 year recidivism rate for offenders with a score of 5, using the same data Dr. Scroppo relied upon, is 12.5%.[FN10]

Thoroughness of Expert Evaluations\Bias Considerations
The court credited a number of conclusions of all of the experts. However, it is obvious that Dr. Scroppo had a significantly better basis on which to make an evaluative conclusion than the State's experts. Dr. Kirschner was not able to interview Mr. F. The court is considering Mr. F.'s failure to meet with Dr. Kirschner and be subject to a psychiatric examination by him as required by the Article 10 statute. See MHL § 10.07 (c). But the court did not agree with Dr. Kirschner's assertion that not talking to a respondent is of little consequence in an evaluation's validity. It seems obvious that the validity of an evaluation is enhanced by a respondent interview.
Dr Lo-Rhoden did not interview Mr. F. in person. Her interview was conducted three years ago. She made judgments about Mr. F.'s demeanor which were partially informed by her three-year-old virtual conversation with him rather than any more recent or in-person assessment. She did not administer psychological tests.
There is no question, in the court's view, that in-person interviews are more informative than interviews by telehealth. That is not to say video interviews are impermissible, invalid or don't produce important information. But it is obvious that, in attempting to obtain a "detailed psychological portrait" of an offender (see Donald DD., 24 NY3d at 188), particularly with someone as volatile, angry and distrustful as Mr. F., an in-person interaction is far superior to one conducted through video. Dr. Scroppo during his testimony outlined how an in-person interview allows an evaluator to assess non-verbal clues which a video interview may miss.
Dr. Scroppo also spoke to Mr. F. for 18 hours which he said was longer than he normally did and was partially based on Mr. F.'s initial belligerence. Dr. Lo-Rhoden did not outline how long she spent with Mr. F. Dr. Scroppo also administered psychological tests on Mr. F. for a period of 6 hours something neither of the State's doctors did. This also gave him a more informed view.
In the court's view, all experts are prone to at least a degree of implicit bias in favor of [*21]the party which hires them. The "allegiance effect" or "allegiance bias" in which an evaluator may skew conclusions towards a retaining party is well-established.[FN11]
None of the experts interviewed collateral contacts, like family members (which may not have been available), treatment providers or counselors. Dr. Kirschner works as an "independent" psychiatric examiner who independently always agrees with the State. He has done so without exception in hundreds of cases since 2010. This court has heard Dr. Kirschner testify in dozens of cases. As the court has observed before, it does not believe Dr. Kirschner consciously modifies his conclusions to support the State's position. The court has credited Dr. Kirschner's conclusions in other cases before and credited some of his findings here. He is highly qualified and an excellent witness. Dr. Kirschner's template for determining whether a respondent has a Mental Abnormality, however, always aligns with the State's. Courts and juries not infrequently conclude that respondents do not suffer from a Mental Abnormality. Dr. Kirschner never does.
On the other hand, in this court's experience, respondents in Article 10 cases also always only present testimony which aligns with their positions. In this court' experience, if an Article 10 respondent attorney has a respondent evaluated by an expert and the expert reaches a conclusion adverse to the respondent the expert will not be presented. A different expert may be retained or no expert testimony may be provided. Dr. Lo-Rhoden is employed by one of the parties in this case, the State. Again, there is obviously nothing impermissible about that. But it is a relevant consideration.
As was revealed during cross-examination, Dr. Lo-Rhoden selected records from STARC which painted Mr. F. in a bad light while ignoring those which portrayed him favorably. Dr. Scroppo made this point during his testimony. Evaluators always must select the records they deem most significant. But the selective recitation of information by Dr. Lo-Rhoden in her report to support the State's position in this case appeared particularly significant. In the court's view, her Static 99-R score was clearly wrong as outlined earlier. Mr. F. was over 60 when he was released from state custody to OMH custody. He will obviously be over 60 at the point he might be released from OMH custody. Dr. Lo-Rhoden cited no authority for her assertion that Mr. F., approaching age 62 and still confined after being transferred from DOCCS to OMH after age 60, should be assessed as if his release from custody occurred prior to turning 60. The court agreed with Dr. Scroppo's contention that Dr. Lo-Rhoden's conclusion in that regard "doesn't make any sense". In fact, Dr. Lo-Rhoden could not recount what Mr. F.'s age was even under the rule she asserted: his age at the time he had been scheduled to be released from DOCSS (rather than actually released from DOCCS to OMH custody or released into the community from the custody of OMH).
There were also instances where Dr. Lo-Rhoden appeared to deny irrefutable facts indicating Mr. F.'s had made progress or that his risk was reducing. In repeated questioning, she declined to agree that the difference between Mr. F. staring at custodial staff and then masturbating on numerous occasions in the 1990's but, on one occasion, staring at a female staff person while seated in 2025 at STARC and not engaging in any sexual-related activity reflected a positive progression. When asked about Mr. F.'s apparent inability to achieve an erection, she refused to assign any significance to it. She made the correct point that an inability to achieve an erection does not prevent a respondent from sexually offending. But it seems obvious such a [*22]consideration would have some relevance in assessing an offender's risk. Even Dr. Lo-Rhoden conceded that Mr. F.'s inability to achieve an erection had resulted in his also having a lower sex drive. Dr. Lo-Rhoden also appeared to construe the commonly accepted conclusion that ASPD declines beginning in a person's fourth decade of life to mean such a decline occurs by age 40. Every one of the numerous experts this court has ever heard discuss this issue has construed this admittedly confusing phrase to mean such a decline begins in a person's 30's (which is literally the fourth decade of life). This apparent disagreement, however, did not impact Dr. Lo-Rhoden's conclusions.
For all of those reasons, the court holds that the State did not prove by clear and convincing evidence that the Respondent Luis F. suffered from a Mental Abnormality. The petition is thereby ordered to be dismissed. This Decision and Order shall be stayed for 30 days to allow the State time to seek a stay pending appeal from the First Department if they choose to do so. This constitutes the Decision and Order of this court.
September 8, 2025
Daniel Conviser, A.J.S.C.

Footnotes

Footnote 1:Testimony at various points in the trial indicated this date was in 2017. However, the certificate of disposition received in evidence indicated the correct date of the incident was July 26, 2018, the conviction date November 22, 2019 and the sentence date December 18, 2019.

Footnote 2:The transcript indicates the word provided here, "mixed" was "missed" but appears to be an error.

Footnote 3:Portions of this court's legal analysis are copied or modified from previous published and unpublished decisions of this court without citation to this court's earlier decisions.

Footnote 4:The DSM-5-TR notes that ASPD "has also been referred to as psychopathy". p. 748.

Footnote 5:This Court faulted Dr. Charder (a psychologist) for relying on speculative "brain scan" evidence (not involving Mr. A.) to support her contention that he suffered from a Mental Abnormality. This Court also outlined how Dr. Charder had testified that Mr. A.'s psychopathy provided him with greater volitional control than offenders with ASPD and negated Article 10's "serious difficulty" requirement. 2015 NY SlipOp at 12-14.

Footnote 6:On remand after the First Department's initial reversal, this court conducted an extended Frye hearing on whether the State's diagnosis of Unspecified Paraphilic Disorder ("USPD") was generally accepted. In State v. Jerome A., Nicholas T. & Gary K, 58 Misc 3d 1202 (A) 2017 NY SlipOp 51762 (U) (Sup Ct, NY County 2017), this Court held that USPD was generally accepted. In State v. Hilton C., 158 AD3d 707 (2nd Dept 2018), however, the Second Department held that USPD was not a generally accepted diagnosis. This Court then reversed its determination to conform to that controlling ruling. Jerome A. then proceeded to a bench trial before a different judge who determined Mr. A did not have a Mental Abnormality. In State v. Jerome A., 172 AD3d 446 (1st Dept 2019), however, the First Department reversed that verdict. It held USPD was a generally accepted diagnosis and since this court had precluded it, the verdict finding Mr. A. did not suffer from a Mental Abnormality had to be reversed. This Court then conducted a bench trial, where it found Mr. A. did suffer from a Mental Abnormality, even though this court rejected the State's USPD diagnosis at the trial — the diagnosis whose absence was the sole basis for the First Department's second reversal. State v. Jerome A., 67 Misc 3d 1220 (A) (Sup Ct, NY County 2020). After being confined for about 6 years awaiting a final determination, Mr. A. was placed on Strict and Intensive Supervision and Treatment in the Community ("SIST") by this court in 2021, over the State's objection. The State then moved to confine him, based on non-sexual misconduct during SIST and the court denied that motion following a hearing. Finally, this court again dismissed Mr. A.'s Article 10 petition on July 28, 2025, with the consent of the State (the third time a trial court had dismissed the proceeding), when the State's examiner concluded he no longer had a Mental Abnormality.

Footnote 7:Cambridge Online English Dictionary

Footnote 8:Miriam Webster Online Dictionary

Footnote 9:The Britannica Online Dictionary

Footnote 10:See Society for the Advancement of Actuarial Risk Needs Assessment (SAARNA), Evaluators Workbook, Predicted Recidivism Rate Table, page 10.

Footnote 11:See e.g. Wikipedia, the online dictionary, the "Allegiance effect (or allegiance bias)".